Judge Smith, can you see and hear us? I can see both you and Judge Barry. Good morning. And I hear you as well. Very good. The first matter is Sheridan v. NGKMetals. Mr. Honig, good morning to you. Good morning to you as well. May it please the Court, my name is Regent Honig and I am arguing this morning on behalf of the appellants in both this matter and the second matter on the Court's docket. I think to a person in this room we're grateful you've devoted this to a brilliant day for us. There are some weighty issues that we'd like to argue. The two cases on the docket today both concern the toxic substance beryllium and most especially how and whether under Pennsylvania law a Pennsylvania citizen can be medically monitored for the adverse health effects of exposure to that beryllium. Could I ask you something in the beginning about the cause of action here? Could you please define what the injury is and when the injury would occur under Pennsylvania law? My understanding is that the beryllium sensitization is asymptomatic and so I would like to nail down when someone contracts a chronic beryllium disease, when does the injury start? When does the statute of limitations begin to run in this manner in your view? You've hit the seminal question on its head because the cause of action in each of these cases is medical monitoring under Pennsylvania law which is not a traditional tort injury insofar as the successful claimant for medical monitoring hasn't yet been diagnosed with the subject injury but is at a significantly increased risk of developing it. So to answer your question, as I understand it, when one has a diagnosis of chronic beryllium disease, CBD, that is to say when you've been told by a physician that you have a demonstrable immune response and some evidence of granuloma on your lung, you have the disease. But this, like other diseases, excuse me, so the statute for cause of action, the statute would begin to run it at the time that's discovered or should have been discovered. That's correct. Not the BES but the CD. That's correct. But is that so? Because Sheridan 1 would suggest that that's not so. Mrs. Sheridan had CDS and she had sensitization but she did not have an impairment that would result in a compensable injury. Now if you're looking at the injury as being the disease, then you're out of Redland soccer, aren't you? And into Simmons. Yes and no. If I may explain. It's very easy with these cases, particularly given the latency period of these diseases, to confuse the cause of action with the injury. And if I may, because the Third Circuit has weighed in on this. Chief Judge Becker wrote a very important decision actually out of this community and plant called the BEC. And that was a statute of limitations case. And the injuries there was CBD itself. So the traditional Pennsylvania analysis for statute of limitations for the two years from the date of diagnosis or when you should have known. So none of these cases present a request for compensation for an injury. Each of these cases, this one and Anthony, is a cause of action for monitoring for the likelihood that you're going to get the disease based on what we claim is a significantly increased risk. So the answer, Chief Judge is it depends on what relief you're seeking. If you're seeking... Mr. Honick. Yes. Mr. Honick, I'm already somewhat confused about the disease. You have used the term the disease several times. What is the disease? Is CBD the disease such that BES is a precursor to the disease? Or is BES part of the disease? Is it part and parcel of CBD? It is part and parcel in this respect. The disease, make no mistake about it, is CBD. What science has learned just in the last six or seven years is that what was initially believed to be simply a marker of injury, namely beryllium sensitization, is in fact the beginning of the progression to full-blown CBD. And I would submit to you this is an issue that the 11th Circuit looked at with great care. Now, Georgia law is different on this subject. In Pennsylvania, the injury is the disease, so that before you get your CBD diagnosis, you don't have an injury claim. What we now know... Only a small percentage of those who have the sensitization are eventually diagnosed as developing CBD. Is that correct? That's incorrect, Judge Smith. And that's one of the most important points of this appeal. When... Both experts, experts in both, you're experts in both cases. Rospin uses the 1% to 3% figure at the risk of being, of, might become sensitized. And your expert in the Anthony case cites studies for the same, with the same figure, which is certainly Rospin's study. That's very, it's awfully confusing, but the 1% to 3% is what the general population would be at risk of contracting if they had an exposure. That's right. That's not the same, as I understand it, as what Judge Smith is asking, which is, what is the percentage that progressed from beryllium sensitization to CBD once BES is detected? That's different. That is different. I thought Judge Smith was asking that such a small percentage of the exposed population has any risk of becoming sensitized. It is true that most experts will posit that the general population exposed in the most generic way is exposed at 10% or less. However, that is not true in an occupational setting where documents and evidence that we've produced in both of these cases indicate, for example, that machinists are at a risk of contraction of 25%. But that's a risk, not a significant risk in terms of the expert testimony in this case. Let me return to Judge Smith's question, because I think it's an important one. Your position has suddenly shifted from sensitivity being a precursor to CBD and being the beginning of the process of CBD. Precisely. In much the same way, for example, that HIV and AIDS are related. But in terms of what we have to decide, does it really make a difference? Because, as I understand the record, the only way of monitoring, and I'll have more to ask about the specific monitoring as of now, would be the ELPT, whether by blood or lung, correct? That is correct. So does it, and you would have the whole exposed population take this test, correct? No, only the part of the population that has demonstrated under Revlins that is at a significant increase. How would they demonstrate it? That's the seminal question. How do you demonstrate you would be at significant risk, or increased risk, of developing a latent disease, CBD, absent sensitization, absent BES, which can only be diagnosed, as I understand it, by the BELPT? The BELPT is only one part of the diagnosis. It is a confirmation that your blood or lung tissue can demonstrate an immune response. It's only one part of the diagnosis. How can CBD be contracted in the absence of BES? It cannot, but it is incorrect to say, as the defendants have been arguing now for years, that you shouldn't be monitored for the significant risk, or the risk of developing CBD. How are you monitored, other than by the BELPT? That is the gold standard tool for the medical monitoring for all adverse health effects. The answer, the question is, how else can one monitor for CBD absent BELPT? Well, the way it was done before the LPT was developed in the 1980s and came into common usage in the 90s was from an open lung biopsy, which was why the disease was so rarely diagnosed. It resembled sarcoidosis and other idiopathic pulmonary fibrotic disease processes. And so, there were not very many cases diagnosed throughout the 60s and 70s, and it was a mistaken belief in the science that they had somehow licked it from an industrial hygiene standpoint. With the advent of the LPT, and being able to have essentially non-invasive blood study to demonstrate the immune response, the whole science changed dramatically. But you have to show that you're at significantly increased risk of developing the disease before you get relief. In other words, you don't... You're quite right, Judge Barry. You're looking to monitor or screen, one can say, to find the people who might have CES. Judge Barry, if I could answer your very first question, which is, what am I asking you to In the case of Sheridan and Zimmerman, that was a class action in which we selected two class representatives, Mr. Zimmerman and Ms. Sheridan, very different class reps. Sheridan already had a diagnosis of CBD, but was asymptomatic. No one disputes that she needs to be monitored for the rest of her life to see if she becomes symptomatic. Let's put aside for the moment whether there's a race eudicata effect. In the case of Zimmerman, one of the world's most preeminent experts in the field, who's just 34 blocks away, said in records that we put into this record that you have, that this man must be monitored. And that's the narrow question you have to determine, whether Judge Prater ignored what we claim are material questions of fact concerning his medical condition. No, no, no. The question is, what we have to decide is whether we apply a poll. Agreed. Which hasn't been mentioned yet. Well, it hasn't directly, but you're quite right, Judge Barry. But here's the question. These cases is science and jurisprudence butting heads. And the question that I'm asking the Third Circuit to do is to untangle that. Here's the way I propose on behalf of the appellants that you do so. Number one, that you read poll as Judge Gardner did, which is that there is not an immutable rule established in poll. Mr. Honick, I don't like to interrupt, but you just said something that, at least to me, was important. And so I want to make sure I understand. By untangling, are you suggesting that poll does entangle both science and jurisprudence? And a sub-question to that is, if the answer is yes, has poll laid down a rule that can only be changed by some subsequent change or development in science that would be brought to the Pennsylvania courts and somehow modify or overrule poll? Let me answer, Judge Smith, the first question, which is I read poll and have always read poll as Judge Gardner did as being highly fact-specific. Recall that this was a 2001 class action brought for residents that was never decided on the merits and Judge Levin in the trial court only determined that it was not certifiable. But what happened was that a dicta that he offered, in his opinion, became essentially substantive law, or at least the way the defendants are reading it, and that is that you can't demonstrate a significantly increased risk for Redland purposes unless you have a brilliant sensitization diagnosis. I have never read poll that way, and Judge Gardner agreed with us, leaving open the question and frankly the requirement under Rule 56 that each case be looked at on its own facts and scientific merit. And so that's the question I think presented in each of these appeals. What is the record that we've established in Sheridan and Zimmerman and then separately in Anthony that makes it look different than poll? Because there's a great, frankly, seduction for jurists to look at poll and say, well, it involves breathing beryllium. The science is more or less the same. We're simply going to apply poll, and that's what happened here. Well, let's say, I assume, Arguendo, we agree with you on your reading of poll. You would have to show then, would you not, that CBD can be contracted in the absence of BES, or at least that there's a significant risk that it could be. And your experts say quite the contrary, don't they? No, Judge Barry. In fact, the experts are uniform in the record we've amassed here in saying that significant risk attaches before sensitization is detected. And the reason they can say that here where they were unable to say that in poll is twofold. Number one, we have the first longitudinal study that was published in 04 that says, without contradiction in the literature, that the vast majority, if not 100 percent, of beryllium-sensitized persons will go on to develop disease at some point in this big latency period. That is hugely important, recognized by the 11th Circuit, because what it means is that beryllium sensitization is no longer just a marker. It is the beginning of a disease progression. And so you can't turn medicine on its head and begin to test someone after they already have the beginning of the disease process. So we have two sets of experts saying, one on the medical side, that you must monitor with the LPT before sensitization is detected, because like HIV or cholesterol, you don't start to take someone's cholesterol after they've had a heart attack or osteoporosis. So you have to monitor the whole exposed population, which is what poll says you don't do. Judge Barry, what happened in poll, that was a six-mile residential class. And quite honestly, the Superior Court of Pennsylvania was offended at the idea, and I understand this, of hundreds of thousands, potentially, persons undergoing this test. That's not what these appeals are about. How many thousands of people? This is one person. This is one mile. And what we have here. It's one person. It's really one person. That's the question before this court. And that is, because we never got to the class-wide issues. The question for Zimmerman, this is so crucial to our appeal, is did Mr. Zimmerman present evidence from physicians that were competent that established he himself was at a significant risk? Now remember, Zimmerman had one positive LPT already. And you do need two. But no less a physician than Dr. Rossman at Penn said, this man must be monitored for the rest of his life with repeat LPTs, clinical evaluations based on his one positive. If he shows clinical symptoms. If he shows, if it's clinically warranted. He didn't just say he must be monitored for the rest of his life. Well, Judge Barrett, respectfully, the record is abundantly clear. There is a statement. It was so important to us that we excerpted it in our brief from Dr. Rossman, who said that Mr. Zimmerman must undergo a lifetime of monitoring to determine if his condition will turn into CBD. So that doesn't almost answer the question here. He has not shown that he is at a significantly increased risk of developing the disease. Judge Barrett, it could occur 40 years from now. This court has already determined that Jane DeBeck, among others, whose statute of limitations were said to have run, in fact hadn't run because they had an exposure duration latency of 40 years. Ms. DeBeck, the Third Circuit had a case, which it decided, which Judge Becker decided, that looked at someone in whom nearly 40 years went by. Ms. Sheridan was 45 years. Exactly. And we said there's no injury, but if an injury shows itself. Here's the point. Even the single defense expert, not in Sheridan, because they offered none, but in the Anthony case that you'll hear about, he agrees that everybody needs to be monitored once exposed over a lifetime. It's not an accident that OSHA requires. What Paul said is not, does not meet the test. No, Judge Barrett. Respectfully, what I think Paul stands for is a failure of expert proof in one case, in which we did not have someone like Dr. Adam Finkel, who was the senior most OSHA officer in charge of risk assessment. We now have a risk assessment that we put into this record in which it's been determined one in 500 members of this community will actually develop full-blown CBD. Well, I think Finkel said that based on other studies. He wanted discovery so that he could decide what was the risk as to this population. I don't think Dr. Finkel would say that at all. And, in fact, he didn't say that in his affidavit. He said unquestionably that I can do an assessment of this community in which by a factor of at least I can do an assessment of this. He hadn't done it. Well, he had, in fact, Judge Barry. He did it in the case of Sheridan and the residential community. I concede that he did not do it in Anthony, which we'll talk about in a minute. That's the occupational setting. And the reason was that we had no discovery on exposure data. And, ironically, even though in that case, presaging the argument there, it was a single legal argument. Does Paul apply or not? We were foreclosed from getting any kind of exposure data. By contrast, we have a ton of exposure data in the Redding community. And Dr. Finkel actually performed QRA, which is what he did for years with OSHA. And the point that I was trying to make, Judge Barry, is that this, you know, I'm unabashed about good lawyers, good plaintiff's lawyers trying to push the envelope on what's good social policy. But I'm here to tell you I'm not doing that. The reason I say that to you with all due respect is that what I'm talking about doing for this community, OSHA does for workers. The DOE has done for decades for its workers. Industry has done for its workers. We are not pushing something that is an exotic breed. The narrow question, I think, that this court has to determine is what did Paul mean? And then applying that to the specific facts of this case, how did the, whether or not these cases came out correctly. I think Paul means what Judge Gardner said it means, that you have to have a significant increased risk demonstrable in whatever way the facts and expert opinions of the specific case is demonstrated. Let me ask you, if we get beyond Zimmerman and we look at a class of everyone who lives within one mile of the plant, how does a medical monitoring situation work in your view under those circumstances? Who's eligible? Everyone who, every resident within that radius? We have proofs, Chief Judge Shurica, that everyone within the one mile radius who lived there during the resident time period is at a significantly increased risk. For a period of how many months? Well, I think the test for at least six months, and that's based on hard science, because science has reported time and again that exposures. Between 1950 and 2000 in your complaint. That's correct. For a 50 year period of time. Now that seems large, and that seems potentially unmanageable. But that's not a question before this court. And in fact, there have been classes certified, albeit not on monitoring issues, but on others that presented much more complex management issues. And respectfully, I think the narrow question presented with this residential community's request for monitoring really boils down to whether or not it's one class representative, Mr. Zimmerman, through his experts presented sufficient questions of fact and science that should have precluded the grant of Zimmerman. Let me just ask one more question. What is the test that would be done to all the residents within this one mile radius? The test that would be offered would simply be the LPT, and then depending upon the result of their LPT, there would be an algorithm. No one doubts or denies that the algorithm for testing for adverse brewing health effects starts with an LPT, and if you have two positives, you then have to have a clinical evaluation. And that's the algorithm that we suggest would need to be applied to properly monitor this community. Not to first see whether there's risk, because the risk is already established. Now Zimmerman has had one positive. One positive LPT thus far. And what we know is, and even the defense expert in Anthony agrees, you can be negative today and positive tomorrow. That's why this disease is so insidious. But the worrisome thing about Mr. Zimmerman, noted by Dr. Rossman, is that he's not only had a positive LPT, but he's also had borderline findings clinically with pulmonary function studies and other clinical indicia of disease beginning to arise. And that's why, in his case, Dr. Rossman was so emphatic that he needed to be monitored. He's the class rep that we chose. Except that when the record closed, in this case, he hadn't gone back to be monitored. But he wasn't asked to go back yet. When the record closed, he had been asked by Dr. Rossman to come back, I forget now if it was an 18 or 24-month period. So you're quite right. The record did close. He hadn't yet gone back, but he was scheduled to do so. But the record is clear. Mind you, there are no experts on the defense side in the Sheridan matter. So they're relying upon their interpretation of poll that absent brilliant sensitization, you can't get monitoring in Pennsylvania. And I submit that the case can and should be decided narrowly. Meaning, was the district court correct in determining that the opinions, the new opinions of the risk analysis from Dr. Finkel, the analysis from Dr. Rossman in which Zimmerman was specifically found to require monitoring, should that be ignored in the face of a granite-like view of poll that says absent two positive LPTs, you can't get monitoring? That's the seminal question. I think we understand your position. And any further questions from my colleagues? Good. We'll have you back. May it please the court, my name is Neil Wittges representing Cabot Corporation. And I think the outcome of this case is controlled by poll, and that's, of course, what we argued in the briefs. In poll, the plaintiff's experts opined, as the plaintiff's experts did here, that everyone exposed to beryllium at levels above background were at a significantly increased risk of contracting CBD and should be medically monitored for the rest of their lives with the DELPT. Mr. Honig says that's essentially dicta, isn't it? I do not believe it's dicta. Poll decided that evidence of beryllium sensitization through the two positive DELPTs was necessary to establish the increased risk, significantly increased risk of contracting CBD because of the following immutable facts about beryllium science and medicine, which were true at the time of poll and were true here, based, as Mr. Honig said, upon plaintiff's own experts. This is not a case in which there are disputes among experts. We relied solely upon the plaintiff's experts, which I think demonstrates the power of this motion as it was in poll. The immutable facts are that CBD results from an immune or allergic-type response to beryllium. Only a subset of the population is susceptible or allergic to beryllium. In poll, the court acknowledged that there was evidence that as much as 35 to 40 percent of the population may be susceptible. Sensitization is a precursor to CBD, and sensitization can be detected through the DELPT. Is sensitization a precursor or is it the beginning of the disease? It's a precursor in the sense that it precedes and is a necessary precondition for disease. Mr. Honig references an article, which is a case series. It's the Newman et al. article, a case series of 55 people, and he claims in his briefing that that article demonstrates that everyone who has sensitization will inevitably progress to CBD. First of all, even if that were true, it's irrelevant because the article would itself reinforce the requirement that sensitization is a precursor, that is, a precondition to disease, and reinforce the poll requirement, but it's not true. What the article says is that for the first six years, between 6 and 8 percent of people progress from sensitization to CBD, and CBD, for purposes of the article, was defined as being asymptomatic. Only one of the people who progressed actually required treatment. Does it really make a difference whether, for our purposes, whether or not it's a precursor or the beginning of the disease? I don't think it makes a difference at all. Whichever it is, we would do the monitoring with the same test. I believe that's true. Ideally, in the ideal world, you want to find out who's going to... If there's some way to determine earlier than the blood test or the lung test that someone is susceptible to becoming sensitized, or whatever the correct lingo is, that would be nice. That would be the ideal, but there isn't any evidence that, in advance of the blood or lung tests, one can determine that, correct? I believe that's true. I'm trying to understand why it makes a difference whether we call BES a precursor or the first step. I don't think it makes a difference at all. I think, in either event, you must be sensitized in order to demonstrate the significantly increased risk. That's what Paul says. I'm not so sure Paul didn't... Paul was decided as a matter of fact, as a matter of effectively undisputed fact or failure to submit evidence. There's some air in there, I think, for your friends across the aisle. Oh, I agree with decided as a matter of fact, and I believe that's what both Judge Prater and Judge... I think Judge Prater said it's a bright line rule. It's a positive rule of law. I think what Judge Prater did is Judge Prater looked at the evidence and said, and this is the way we had argued in the briefs and argued here, is that the evidence submitted here has no material differences from the evidence that was submitted in Paul. In the absence of a material difference, we apply Paul, the court applied Paul as a matter of law. That's our argument. I think that's what Judge Gardner did as well. So Judge Prater didn't... It doesn't really make a difference for our purposes whether it is decided as a matter of positive law or as a matter of undisputed fact. Well, we never argued it's just a legal rule. I mean, we didn't file a 12B6 motion and say... And your briefs are arguing, well, you argue a little different in each of the cases depending on what the particular judge said. But we waited for their evidence and we submitted their evidence, which we demonstrated to Judge Prater, and Judge Prater went through it step by step and said this evidence is the same as Paul. Therefore, I apply Paul... But you were really arguing before Judge Prater that it was a positive rule of law. It's a positive rule of law based upon the evidence submitted, which, as we say, is immutable and the same. And I think that's what Judge Gardner did. I think he approached it a little differently. Judge Gardner, I think, approached it, before I look at Paul, let me look at the facts. And the facts are these. And he identified the four facts that I say are immutable. He then took those four facts and say, those are the four facts that the court relied upon in Paul, and he applied Paul to those facts. So I think Judge Gardner perhaps left open what I would say is a theoretical possibility that there could be a change in the science. Yes. And once he went through that... And I think your friends across the aisle are arguing there has been a change. And we believe we've demonstrated there has been no change because those immutable facts remain true. And what he says is the different fact in this case is that everyone who was sensitized progresses to CBD. Again, I don't think that's a material change, in fact, if it were true, but it's not true. The truth is that, and Glazer says this in his affidavit, greater than 50%. Well, the Paul court acknowledged that 50% will progress. And again, if you look at the article, the article does not show that everyone progresses. The article shows that between 6% and 8% progress within the first six years. The conclusion is rates of progression beyond six years are too unstable to predict. And... Is the practical effect of Paul in a case like this where you have genetic markers and susceptibility that there really is no way to medically monitor or screen for the contraction of the chronic Borrelian disease? Well, I believe if a plaintiff were to come forward with evidence of sensitization, they would survive this motion. There are other elements that we would argue, but they would, and that's what the Paul court said. But, and I believe Judge Barry had been making this point earlier, that what they're really trying to do is they're saying an exposed population has a greater risk than an unexposed population. Well, that's a truism. So you're saying exposure plus sensitization get you to a jury? Get you over this issue, and that's what Paul says. But what I think the plaintiffs are trying to do is what Judge Barry referred to, and what we refer to as screening. What they're trying to do is we say, we know there's a population that's been exposed to Borrelian. And we know that exposed populations will have a greater incidence of disease than unexposed population. So let's screen that population to identify those among the exposed population who in fact have this significantly increased risk who are Borrelian sensitized. And while the issue before this court is a single plaintiff, Mr. Zimmerman, the implication is far broader because the implication of allowing medical monitoring to an exposed population is that anyone exposed, it gets you right back to Paul. This may be a class that's only a one mile radius, a subset of Paul brought by Mr. Zimmerman, who was himself a member of the Paul class. But the implication is that we'd be right back where Paul said we shouldn't go. If Mr. Zimmerman had the second positive test, then he would be eligible. I'm sorry, Judge. If Mr. Zimmerman had had a second positive test, he would be eligible then. If Mr. Zimmerman had two positive blood tests or one positive lavage, we would acknowledge that for purposes of summary judgment, he has evidence of Borrelian sensitization and would survive this motion. There were again, other elements of the cause of action that we would challenge, but the Paul court acknowledged that. And the one positive is insufficient. Dr. Rossman testified that Mr. Zimmerman was not Borrelian sensitized. And so there's no evidence of that requirement. So would you acknowledge or concede that Paul, if Mr. Honig had submitted or could at some future time, based on scientific change, submit evidence that there is a significant risk of contracting CBD in the absence of BES, you would agree, would you not, that Paul would permit relief? Well, if there's sufficient credible science, I mean, his experts in Paul said, they're at significant, they're at risk from exposure. And that's what his experts say here. But the scientific truth remains that- But if there was expert test, that's not merely conclusory, that you can contract CBD in the absence of sensitization. Always room for that, doesn't it? Yes, Your Honor. What about Simmons v. Paycor? Well, Simmons v. Paycor I think is instructive here because in that case, which was an asbestos case, of course, and asbestos, at least in the case, there was no evidence, and I don't think there is evidence in science that you need this precursor or that it's a sensitized or allergic-type response. But even in that case, the Supreme Court wasn't saying anyone exposed to asbestos gets monitoring. They said these plaintiffs who had evidence of asymptomatic pleural thickening, had they brought a medical monitoring claim, that's the dictum. We would have gone on to say that they maybe could have pursued that, but they didn't bring it. So I think it's instructive because even in a dust-induced case, which Dr. Glazer distinguishes from an allergic or immune response-type case with beryllium, the Supreme Court of Pennsylvania said that we're not giving monitoring to everyone on mere exposure. They said we would have for these people with asymptomatic pleural thickening. So I think that is instructive. Mrs. Sheridan could have gotten medical monitoring had she sought it. Could she not have? Well, Mrs. Sheridan would have survived this motion if she had brought a medical monitoring claim and Sheridan won. But she did not. And I don't know whether Your Honor wants me to speak of the claim preclusion issue at all. It wasn't really discussed in the appellant's argument. But yes, she would have survived this motion. Again, we would litigate the other elements of the Redlin cause of action to see whether even someone in her situation- Would it have been a Redlin cause of action then? I mean, she had the disease. Well, she has asymptomatic CBD. No, that's right. She didn't have an injury, but she had the disease. She did not have an injury. And she was sensitized. She's one of the 55 people in the Newman article. I mean, she's one of the people in the Meyer article that's in the record. She is both sensitized and has a clinical diagnosis of CBD in the sense that she had evidence of granulomas, but this court and Chief Judge Barter below concluded that there was no evidence of impairment. So under Simmons, to get back to the Simmons case, she has no personal injury cause of action. And of course, our argument is that she's precluded from bringing the medical monitoring claim after her personal injury claim is dismissed because it's part of the same cause of action for claim preclusion purposes. Great. Any other questions from my colleagues? Good. Thank you very much, Mr. Wittges. Thank you. Good. Mr. DiLorenzo. Good morning. Good morning, Your Honors. Thomas DiLorenzo for NGK Metals Corporation. Just to kind of set the stage briefly, I'm in a different situation from Mr. Wittges. I represent NGK Metals only in Zimmerman's claim. We were not in the Anthony case, and Ms. Sheridan dismissed her case against us because we did not operate the plant when she lived in the area. So I'm here only talking about Zimmerman. And I think in terms of – we've been litigating these cases for 10 years now, so we've had these arguments before. And I think it's always important – and it kind of gets lost in all these esoteric questions about the medicine and the science and so forth – I think it's always important to remind all of us that we're talking about the Redland soccer case. That's the law of Pennsylvania. It is an unusual cause of action. Not all the states recognize medical monitoring. As Mr. Honig says, you're giving a cause of action to somebody who's not even injured. It's a balancing test, obviously. And so in doing that, the Pennsylvania Supreme Court set forth seven requirements that have to be met, and they apply them strictly. And that's what the judges in Pohl have done, and that's what the judges in this court have done, in the lower court, the district court. The one we're concerned about, of course, is that the plaintiff must prove, as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease. Now, it's important to note that the case in Redland said plaintiff must prove that plaintiff has a significantly increased risk. Not that the population of which plaintiff is a part has a significantly increased risk. Not that some generic population in the Redding community over 50 years has a significantly increased risk, but that this plaintiff, Mr. Zimmerman, has a significantly increased risk of contracting a serious latent disease. And the proof of that is not present in this case. Yes, he had one positive DELPT, but even Dr. Rossman, who Mr. Honig has cited a number of occasions, Dr. Rossman testified in this case that he could not say that Mr. Zimmerman is sensitized. And without sensitization, you can't say that he's going to go on to get CBD. Because unlike the PCBs that were issued in the Paoli rail yard case, unlike asbestos in the Simmons versus Baker case, this is an unusual type of disease. It's an allergic reaction. If I'm not allergic to beryllium, I can stand there and be exposed to beryllium for 50 years and according to the science now, I'm not going to get CBD. That's why talking about the population as a whole, saying you want to monitor the population based only on exposure does not apply here and should not apply here because we're talking about a disease that has a genetic and an allergic component. And so a plaintiff has to prove  who may go on to contract CBD if he's exposed. Plaintiffs all along, from the beginning of this litigation through to now, have been pushing trying to get this acceptance that exposure equals significantly increased risk and yet the science isn't there. And Judge Prater looked at that closely. She looked at that argument and said, no, we can't accept that. Judge Gardner in the Anthony case said the same thing. Judge Levin in the state court case in the two poll one and two said the same thing. All the courts that have looked at this and done the analysis of the facts, done the analysis of the proofs presented by plaintiff, every one of them has come to the same conclusion. The 11th Circuit? The 11th Circuit, it's different law. It's different law in Georgia. We're talking about Pennsylvania law and a specific case, Redland soccer, and what you have to prove to get to medical monitoring in Pennsylvania and plaintiffs simply can't prove it here. Now, as Judge Berrient asked before, perhaps if the law or the science changes and there's some other way to determine whether somebody's at significantly, an individual is at a significantly increased risk besides the BELPT, we'll be back here with a different case. But that's not where we are now. That's not what the science is. And, you know, whether you go at it, I think, I agree, I don't think there's much of a difference between what Judge Gardner and Judge Prater did. They both essentially conducted factual inquiries and came to the same conclusion. And I think that's really what you have to keep in mind. The strict requirements of Redland soccer, that's the law of Pennsylvania. The Supreme Court of Pennsylvania denied allocator twice in poll. They had an opportunity to address this case, not in some related matter  that might have provided guidance. The Supreme Court of Pennsylvania had an opportunity to address beryllium disease, CBD, sensitization and Redland soccer twice and they declined. And we're left then with the superior court case setting the law of Pennsylvania. And that's what Judge Gardner and Judge Prater have applied appropriately. We have a certification procedure here in federal court where we can certify letters to the state Supreme Court. What's your opinion on that? I don't think there's any need to. I think the Pennsylvania courts have spoken. And as I say, as much as plaintiffs have tried to change what the law should be, the law is clear and the science and facts have not changed in the last 10 years to make the law any different. And Mr. Hona kind of makes it sound like, well, back in the days of poll, that were years ago. Well, poll two, the trial court decided in 2006, it was affirmed by the superior court in 2007 and Alicante was denied in 2008. I mean, maybe because I'm older or whatever, but that's not that long ago to me. This is recent history, recent law, recent medicine, all of which has been addressed by courts in Pennsylvania and by the district courts in this district. And they all come to the same conclusion because that's what the science and the medicine show. And when you apply that to the law of Pennsylvania, everybody arrives at the same conclusion. Any other questions? Thank you, Mr. Lorenzo. Mr. Imbriglia. May it please the court. My name is Steven Imbriglia. I represent an engineering firm by the name of Spots, Demons, and McCoy in this case. Spots, Demons, and McCoy is an engineering firm from Wyomissing, Pennsylvania. I'm here on a somewhat different issue than the one you've been talking about, specifically whether Judge Prater erred when she dismissed the complaint on the 12B6 motion against Spots, Demons for failure to state a claim. I would suggest to the court that Judge Prater's decision should be upheld because she was simply applying a long line of cases, both from this court, from the federal courts, and the state courts, that Section 324A of the Restatement Second of Torts does not apply in this case and should not be applied in this case to impose a duty upon Spots, Demons to the plaintiffs and, in a larger sense, to the class that the plaintiffs report to represent. Spots, Demons, according to the complaint, the amended complaint, was engaged to conduct air sampling, stack testing at the plant. Spots, Demons never operated the plant or owned the plant, and there's no allegation that the stack testing or sampling was conducted negligently. In fact, the plaintiffs rely on the results of the stack sampling in bringing their case against the co-defendants. The theory that the plaintiffs wish this court to accept is that by conducting the sampling correctly and competently and by reporting the results timely and in a competent manner, that somehow a duty to the plaintiffs, to the people who lived outside the plant, was created, something, a duty to advise or warn the community about the results of the sampling somehow evolved. The law is simply not that way. There's a long line of decisions running back to the Evans decisions from this court in 1968, continuing with the Patentes decision in 1982, that in order for Section 324A to apply, the defendant must have specifically undertaken the task that it is accused of performing negligently. There is no allegation in the amended complaint that Spot-Stevens and McCoy ever agreed to warn the community or to take any steps to protect the community. The complaint simply alleges that Spot-Stevens and McCoy was engaged to perform this type of testing and that it did so competently. The plaintiffs, the appellants, seem to be suggesting that although the original undertaking under Section 324A was the conducting of the stack testing in the air sampling, that because the results were not what one would have wanted, that somehow a second duty arose to the greater community and that Spot-Stevens somehow should have been to warn the community about the results of the tests. But there's no legal authority for that opinion and there's no legal authority for that view that somehow because the results of the tests were less than desirable, that a duty for Spot-Stevens to do more than competently test and report the results somehow was created. I'd just like to address one point that's made in the appellant's reply brief where a case, a Pennsylvania case called Faribault is cited by the appellants in support of the idea that when someone contracts to do something, that person can be held liable if he does it negligently. There's nothing radical about that notion that the Faribault decision does not change the results of Judge Prater's decision in this case in any way. In Faribault, the construction case and the question was the liability of a construction manager for the death of an employee of the general contractor on the site. But importantly in that case, the construction manager was paid to assume an active role in assuring the safety of the worksite. So that was in the contract. That was an undertaking of the construction manager in that case. That is simply different than the case before this court where Scott Stevens and McCoy never undertook to protect the larger community, was not in his contract and never assumed that responsibility. Good, any questions? Good, thank you very much, Mr. O'Grady. Mr. Honig? Let me thank you again for the luxury of this attention and I'm gonna try to be brief because there's really quite a bit of overlap here. And this was actually very instructive for me to hear some of these arguments, frankly, to sharpen my own arguments. I always hate to disagree with Mr. DiLorenzo, but I have to do so here. He implied that because the last of the petitions for Alicante were denied in 07 or 08, that somehow there was included in that petition consideration changes in the medicine. And respectfully, that's not so. You know, poll has two lifespans. There's poll one and poll two. Poll one, the record for poll one was concluded in 2003. That's when denial of class certification occurred in the trial court. That record, that is the experts, the depositions, everything on file, never changed, never changed. Poll two was the remnants of the denial of class certification with the three remaining individuals. And their cases individually were denied on summary judgment. Again, the record never changed. Now, why is this significant? Why do I bring it up in the first instance to discuss with you, not only the occupational case of Anthony, but to touch back upon the residential or environmental case of Sheridan? The reason is that I don't think the Third Circuit's jurisprudence should ever venture into deciding science. What I would ask you to do with the help of your clerks is to go back and ask this question. Did the plaintiffs in each of these cases present scientific evidence that looked materially different than the record that was created in poll? If the answer to that is an honest yes, I would ask you on behalf of each of these proposed classes of plaintiffs, for whom their merits decision remains quite a ways down the road, that you give them an opportunity both to conduct discovery and to demonstrate to a fact finder, not an appellate body, that what their experts say is so. It is stunning to me that in the Zimmerman and Sheridan cases, that there's not a single expert from the defense saying that risk doesn't attach until sensitization occurs. And Judge Barry, as I listened to you, I wrote down, you asked an extremely important question. What difference does it make if the LPT is the tool, what difference does it make whether it's before or after? But that's the entire question here. When do you give the LPT? When do you give it? Do you give it after your HIV? Do you give it after you have a positive blood pregnancy test? Do you give it after you have atherosclerosis? Our experts say- But I still don't understand. Our experts say- You're going to give it. So what difference, that would be your monitoring tool. So what difference does it make? Judge, our plaintiffs want the defendants to pay for a study, a test, that they're not going to get on their own and that they're never going to know about unless we send out a class notice. The experts in this case, as recently as two years ago, the world's leading beryllium health experts said there will be over 200 cases of CBD conservatively within one mile of this plant if we test. Those cases are there. The question is, will you permit it to go? And the answer is yes, because under Redlands, our experts have demonstrated that there is a significant risk to Zimmerman specifically, as Mr. DiLorenzo asked, because that is the question. But quite candidly, for this community, the science has changed. There is now, in the Journal of Thoracic Medicine, an article that appeared only a year, maybe two at this point, that studied the Redding community. And in that, the world's leading beryllium experts, our experts, not their experts, said in a peer-reviewed article there will be 200 cases of CBD if we find them, if you allow us to look for them. Now, that's what we're asking to do. In Redlands, that's precisely what the Supreme Court of Pennsylvania recognized, that if you put an expert... If you let us look for them, isn't that the rub, though? It's your burden to identify who has the significant... That is the rub, Judge Barry. You know, semantics is important, and at other times, it's not. It's more than semantics. That's Redland's author. I completely agree. It's our burden to demonstrate significant risk. In the case of Sheridan and Zimmerman, we've already established that Sheridan clearly has to be monitored. So the question is, did we do so in Zimmerman? That's the question faced by you. And I submit to you, and I ask you with all due respect, what more must a plaintiff do than to have the world's leading expert at Penn say, this man has to be monitored. He is at a significantly increased risk that's different than you, and you, and me, and everybody in this room, because he lived one mile from the plant his whole life. What more must we do? That declaration from Dr. Rossman, the declaration from Dr. Finkel, the OSHA expert, who quantified the risk mathematically, which Faust says we don't have to do, but we did anyway. What more must we do jurisprudentially to get a day in court and place that evidence in front of a jury? The error that we assign with respect to the courts below is that they've looked mechanically at Pohl and said, in the absence of two positive LPTs, Mr. Honig, we're just not going to look at it. That's why the mantra, that's what it is. It's a mantra from Mr. Witk is saying there are three immutable truths. They want an opinion from the Third Circuit that says there are three immutable truths that haven't changed over time. Therefore, Pohl applies. And although Judge Gardner theoretically is correct that there could be a case, well, that's wrong. We have presented that case. And the reason I say that is because both in the case of the occupational setting with the plant, with our expert opinion and Judge and Dr. Repscher disagreeing, you have a material question of fact between two competing experts. The 11th Circuit said, we're not going to get involved. That's what I'm asking the Third Circuit to do is to say, I'm not going to determine where on the continuum of risk the risk attaches. That's for the experts. Where the experts all agree that it's here, we can make a judgment. Isn't the ultimate question for us whether we are convinced by persuasive data that the Supreme Court of Pennsylvania would not follow Pohl? And that's the ultimate question for us. I don't think it is with all due respect, Judge Barry. I think that this court is empowered to do exactly as Judge Gardner did and that our appellate courts do all the time in reading decisions narrowly. If you read Pohl narrowly, what it stands for, and the language is clear, it says you can demonstrate significant risk by being beryllium sensitized or some other significant risk. What we've done in these two cases here is to use the or, is to say to you, the science was not that clear in 03 where the risk attaches on this continuum. I agree that our experts in Pohl did not adequately address the risk. What they did, to be candid with you, the Pennsylvania Department of Health found 39 cases within a six mile radius of the plant. And we, frankly, I thought as a plaintiff's lawyer, that's enough. I got the best experts in the world. I got the Pennsylvania Department of Health saying there are 39 cases. That is a significant risk. Well, I miscalculated. So what we did was to reload and we paid great heed to Redlands. And I came in here with the best QRA risk assessor in the country. I came in here with the best industrial hygienists and the best medical experts in beryllium, and they all lined up, Judge Barry, and said, these individuals need to be monitored and so does the class. And the question is, can you accept that science or are you going to cling to an interpretation of Pohl that says only two positive. So you're really saying we can apply Pohl and find that what you presented is the persuasive evidence. Yes. The opinion I would write is that Pohl is still vital. It's an attempt by that appellate court, state appellate court, to determine where significant risk attaches in the context of beryllium exposure. And what the plaintiffs in these two cases have now done, whether they persuade a jury is a separate question, but what they've now done is to at least put into the record the idea that risk can attach and does attach before sensitization is found. That's what Honig has proved or at least put into question. And in the absence, frankly,  I'm full of it, I think you're duty bound as a matter of jurisprudence, frankly, to say we're not going to venture into this science. We're simply going to recognize that some experts are now saying in ways that we can read from Mr. Honig's declarations that risk can and does attach before sensitization is diagnosed. And therefore, what Judge Gardner found is correct. Because of exposure. Obviously, it all comes from exposure. And we could do that while applying Pohl. As opposed to rejecting it. Absolutely. I don't think Pohl needs to be rejected. And to pick up on a point, Chief Judge Sirica, we did say in Pohl in 03, mere exposure is enough. We don't say that anymore. The reason we put six miles down to one mile is because the data, and it's all in our reports of the amount of beryllium in the one mile radius versus the six mile radius is hugely larger. So what our experts are now saying is not mere exposure. They're saying massive exposure within one mile produces significant risk. So we tried to cover it from the industrial hygiene, from the exposure data, and from the medicine. And our case is respectfully very different. And all we're asking  But you still have, you still have, you have enormous, there's an enormous amount of scientific literature that you could have massive amounts of exposure. And if you're not sensitized, you are not going to get the disease. And then you have people who have not been exposed for various, Ms. Sheridan lived in, wherever she lived, for five years in the, you know, in the 40s or 50s, five years. And she's sensitized. So you still have the bottom line figure there are not going to be a lot of people who, who will be, who might become sensitized. We have, we have a peer-reviewed study that says out of the theoretical 2100 people, that's, this is what the study says. It's in our, it's in the record. Out of 2100 people, 210 will develop full-blown CBD. That is a public health disaster. That's what our people talk about. So in the grand scheme of things, we can sit back and look at the numbers and say in relation to this large population, 1%, 3%, 10% doesn't look like much, but it means a heck of a lot to the people who lose mothers and fathers and daughters and children to this disease. 10% is mammoth. We still don't know who specifically. You're correct. You're correct. We all know people who smoke cigarettes, who don't get lung cancer and don't die of heart disease. But that doesn't prevent the public health community from saying don't smoke. It's one of the worst things you can do. There's no guarantee you will have lung cancer. Let me see if my colleagues have any more questions. Yes, thank you. Good. We'll have you back on the next case. Well, I think I'm here on the next case. And I've been talking about beryllium health generally, but I'll direct myself and conclude and sit down so that you can hear the defense. I didn't realize that you were, you had moved completely into the next one of the reasons that we we filed a motion to consolidate these appeals because there are tremendously overlapping issues. Absolutely. And the only thing, Chief Judge, well, we'll give you I'll give you some more time. I'll take very little of it because the issues are very much overlapping. As significant as we think the risk is demonstrable attached to residential and environmental exposure. We think it's exponentially clearer still in the occupational setting. And what we have in the U.S. Gage plant is not some enormous population, but a very well-defined worker population in which both the science and industrial hygiene has decades of experience of understanding and quantifying risk. What we produce in that case, not dissimilar in general to the expert evidence in the residential Sheridan Zimmerman case was very powerful proof that the machinists at the U.S. Gage plant having worked for years without any type of environmental controls or work controls are at a significantly increased risk of contracting CPD. That they have never been tested and that they should be. We used as a paradigm for our discussion and expert proofs the programs that exist in other worker communities and most especially from Rush Wellman which has been brought in as an additional defendant, not by us, but by one of the defendants. They for years have been doing exactly what we're seeking to have on behalf of the worker class at U.S. Gage and that is a robust monitoring program in order to look for disease in that community. We know from the evidence that we've amassed that machinists who work with beryllium contract that disease at rates of 25% and up. And in fact, some of the documentary evidence that we've amassed in this case shows that as much as 40% of this worker population is at risk for contracting CPD. Now, what is the specific error that we assign to the proceeding below that resulted in the dismissal of our case? Mr. Ubersack should probably be at the council table. If we're into Anthony now. Well, I'm the appellant and I'm just concluding my argument. I expect that... Are you concluding Sheridan or into Anthony? I've been, as I understand it, Judge Barry, Chief Judge Shurka has given me additional time to discuss the specifics on behalf of the appellants in Anthony. I'm soon to conclude and I fully expect Mr. Ubersack to stand up after me and address the Brush-Wellman position. Good. You moved so effortlessly into Anthony that I thought it would be better to keep you there. But Mr. DiLorenzo, you may depart and we'll get your colleague in there. He may wish to take advantage of the table to write down a few things. Or have a drink of water or something.